IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                           No. 3:20-cr-00022-HZ

                    Plaintiff,                      OPINION & ORDER

        v.

DUSTIN LEE HENDERSON,

                    Defendant.

Scott E. Asphaug
United States Attorney
District of Oregon
Katherine A. Rykken
Cassady Anne Adams
Lewis S. Burkhart
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204

        Attorneys for Plaintiff

Joanna T. Perini-Abbott
Angeli Law Group LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204

Samuel C. Kauffman
Kauffman Kilberg LLC
1050 SW 6th Avenue, Suite 1414
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      On January 22, 2020, a grand jury indicted Defendant Dustin Lee Henderson on charges of Interference with Commerce by Threats or Violence (18 U.S.C. § 1951), Possession of a Firearm in Furtherance of a Crime of Violence (18 U.S.C. § 924(c)(1)(A)), and Felon in Possession of a Firearm (18 U.S.C. § 922(g)(1). Defendant moves to suppress all evidence recovered from his home pursuant to a search warrant because seizure of that evidence is tainted by an earlier allegedly unlawful search. The Court held a hearing on this matter on March 2, 2022. Because Defendant does not present facts showing a causal connection between the alleged unlawful search and the evidence obtained when officers executed the search warrant, his motion to suppress is denied.

## BACKGROUND

      At around 1:20 pm on November 22, 2019, an individual brandished a handgun while robbing the Lighthouse Deli in Clackamas County, Oregon. The suspect showed the gun to a store clerk and told her to put five cartons of cigarettes into a brown paper bag with handles that he handed to her. The suspect took the bag containing the cigarettes and fled the scene. Based on descriptions by Lighthouse Deli employees and surveillance video, police determined that the suspect was wearing a dark jacket over a white T-shirt, denim jeans, and flip-flops. Govt. Ex. 1 at 7. A K-9 unit tracked the suspect to a nearby mobile home park. *Id.* at 8-9. A deputy saw Defendant outside of a mobile home, and after seeing screenshots from the deli, the deputy

identified Defendant as the suspect.[1] *Id.* at 9. When the deputy returned to the mobile home and other law enforcement officers arrived, Defendant was inside the home with his father. *Id.*

As members of the Special Weapons and Tactics ("SWAT") team took positions around the mobile home, Defendant's father came out and spoke with deputies. A few minutes later, Defendant exited the home, sat on the front steps, and began smoking a cigarette. At some point, Defendant stood up, lifted his shirt to show his waist band, and turned around in a full circle.

After Defendant declined to follow officers' commands to come off the front steps and walk towards them, a canine was unleashed. After the canine bit Defendant, officers moved forward and arrested Defendant. Officers did not find a firearm on Defendant's person. Shortly after the arrest, some officers entered the home and performed a limited search. Clackamas County Deputy Ryan Castro, a member of the SWAT team, testified that he and a small team of officers checked places in the mobile home large enough to contain a person and then immediately exited the home. At the time the officers entered the home, a search warrant had not yet been obtained.

As part of the investigation team, Detective Jed Wilson was assigned to draft a sworn affidavit in support of a warrant to search Defendant's home and obtain an oral swab for DNA from Defendant. Govt. Ex. 1. Detective Wilson was not on the scene during the arrest. To obtain information for the affidavit, Detective Wilson communicated with several other officers by phone, text message, and in person. He testified that he was unaware of the initial entry into the

---

[1] According to log of police calls and radio communications, law enforcement first received a call from the Lighthouse Deli about the robbery at 1:38 PM. Govt. Ex. 1 at 11. A deputy reported first seeing Defendant in front of his residence at 2:05 PM. *Id.* Defendant was arrested at 3:02 PM. *Id.*

home when he wrote the affidavit. He also did not know who made the decision to seek a search warrant.

> The affidavit described the following evidence to be found in the home:

> A black .22 LR caliber handgun, Marlboro Red 100 cigarettes and associated packaging, Marlboro Black 100 cigarettes and associated packaging, Marlboro Menthol 100 cigarettes and associated packaging, a brown paper bag with handles, a dark colored zip up hooded sweatshirt, a white t-shirt, denim jeans with white decorative cross patterns on the rear pockets, black "flip flop" style sandals, and DNA evidence which may later be analyzed by scientists of the Oregon State Police forensic lab or other qualified persons.

*Id.* at 4. In support of probable cause that these items would be found in the home, Detective Wilson included descriptions of the suspect's clothes by Lighthouse Deli employees, described screenshots from the store's surveillance video that were texted to him, and described a handgun that Defendant's father kept in the home. *Id.* The affidavit did not mention the initial entry into the home by the SWAT team.

While awaiting the warrant, law enforcement officers remained outside the home with Defendant and his father. Defendant's father asked to enter the home to retrieve his keys and some other personal belongings. *Id.* at 10-11. Detective Jeffrey Miller escorted Defendant's father into the home and asked Defendant's father where the handgun was located. *Id.* at 10. Defendant's father showed the deputy that the gun was in the kitchen inside a cabinet. *Id.* at 11. With the father's consent, Deputy Miller pulled out the bottom cabinet drawer and saw the gun. *Id.* He took a photograph of the gun but did not touch or move it. Defendant does not challenge Deputy Miller's entry into the home or identification of the handgun pursuant to his father's consent.

Later, officers executed the search warrant and seized the handgun, cartons of cigarettes of the type identified in the warrant, and the identified clothing. Defendant seeks to suppress this evidence.

## DISCUSSION

Defendant moves to suppress all evidence recovered from his home pursuant to the search warrant. Defendant contends that the warrant search was tainted by an earlier unlawful entry into the home by members of the SWAT team. Defendant contends that (1) the initial pre-warrant entry into the home violated the Fourth Amendment; and (2) officers relied on information obtained during the initial sweep to obtain the search warrant. Defendant argues that items described in the search warrant affidavit where first seen by the SWAT members in plain view. Thus, according to Defendant, the decision to seek a warrant and information included in the warrant were driven by an initial unlawful entry. Defendant therefore argues that all evidence seized when officers executed the search warrant was the indirect result of an unlawful search and should be suppressed under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963).

## I. Legality of Pre-Warrant Entry into the Home

The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. Searches by law enforcement conducted without warrants "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One established exception to the warrant requirement is a limited search incident to a lawful arrest conducted for the safety of officers and others in the area of the arrest. *See Chimel v. California*, 395 U.S. 752, 755 (1969).

Defendant claims that while he was on the ground at the time of the arrest, he heard officers discussing whether to "search the place."[2] Def. Mot. 4, ECF 53. Defendant asserts that officers entered the mobile home before a warrant was obtained, and "it can be assumed" that officers saw important items of evidence in the home. *Id.* at 5-6. Defendant argues that law enforcement's decision to obtain a search warrant was motivated by what officers saw in plain view during the initial entry. The Government does not deny that Deputy Castro and other SWAT team members entered the home before a search warrant was obtained and before Defendant's father consented. But the Government argues that the initial entry was justified because its purpose was to conduct a "protective sweep of the residence" incident to Defendant's arrest. Govt. Resp. 1, ECF 55.

A "protective sweep" is a limited search of a residence, incident to a lawful arrest, conducted to protect the safety of police officers or others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is "confined to a cursory visual inspection of those places in which a person might be hiding" who could pose danger to the officers or others. *Id.* To justify such a warrantless search of a home, officers must show that they had a "reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Id.* at 336. Officers making a lawful arrest in a home may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *United States v. Iruke*, 544 F. App'x 663, 666 (9th Cir. 2013) (quoting *Buie*, 494 U.S. at 334). In addition, officers may a conduct a broader protective sweep if they possess "a reasonable belief

---

[2] Defendant also testified that when he was inside the mobile home just before his arrest and officers had surrounded the home, there were approximately ten police drones inside the home watching him. Defendant does not explain when or how drones entered the home, but he believes the drones were inside because the air was shimmering and he could hear a faint hum.

based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Lemus*, 582 F.3d 958, 963 n.2 (9th Cir. 2009) (quoting *Buie*, 494 U.S. at 337). A protective sweep should "last no longer than it takes to complete the arrest and depart the premises." *Id.* at 962 (quoting *Buie*, 494 U.S. at 335-36).

Defendant does not argue that his arrest was unlawful. But Defendant argues that the arresting officers were not justified in conducting a protective sweep under *Buie* because he was arrested outside his home. According to Defendant, "*Buie* cannot be used as a justification to enter a dwelling where law enforcement otherwise cannot be." Def. Mot. 10. But so long as an arrest is lawful, a protective sweep may be justified, even if the defendant is not arrested inside their home. Courts have upheld protective sweeps of the interior of homes when defendants had been arrested just outside their homes. See, e.g., *United States v. Hoyos*, 892 F.2d 1387, 1398 (9th Cir. 1989), *overruled on other grounds*, *United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc); *Sharrar v. Felsing*, 128 F.3d 810, 824 (3rd Cir. 1997) ("[W]e see no reason to impose a bright line rule limiting protective sweeps to in-home arrests."). "When officers lawfully arrest a person immediately outside his home, they may search the interior of the home so long as they have a reasonable suspicion of danger." *United States v. Mackey*, 431 F. App'x 594, 595 (9th Cir. 2011) (internal quotations and citation omitted). Courts have reasoned that an arrest executed just outside a home "can pose an equally serious threat to the arresting officer as one that occurs in the home." *United States v. Lawlor*, 406 F.3d 37, 41 (1st Cir. 2005); *see United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) ("[I]n some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers.").

Defendant had exited the mobile home and was sitting on the front steps when he was arrested. Several officers were in the immediate vicinity when Defendant was handcuffed on the

ground beside the steps in front of a sliding glass door. If the officers reasonably suspected someone else could be inside the home, their position of vulnerability next to the sliding glass door would justify a brief entry and sweep of the home. *See Mackey*, 431 F. App'x at 595 ("[R]ecognizing their vulnerability while standing on the porch next to two large windows, to ensure their safety the officers reasonably entered the home to make a brief survey of the places where another person could hide."); *Hoyos*, 892 F.2d at 1397 ("A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."). Thus, even though Defendant was arrested in front of the mobile home rather than in the home, the *Buie* rational for a protective sweep applies.

But a protective sweep of a home incident to a lawful arrest must be justified by sufficient articulable facts showing that the officers reasonably believed that persons who might pose a danger were present in the home. *United States v. Johnson*, 8 F.3d 32, 1993 WL 385433, at \*3 (9th Cir. 1993) (unpublished table decision). "For an officer to harbor a reasonable suspicion of danger there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Paopao*, 469 F.3d 760, 766 (9th Cir. 2006) (internal quotations and citations omitted). A protective sweep cannot be justified by mere speculation that another person *might* be inside the home. *Colbert,* 76 F.3d at 778.

The Government argues that the officers were justified in conducting a protective sweep because a violent offense had just occurred. Defendant was arrested outside his mobile home shortly after committing an armed robbery. But an arrest for a violent crime is insufficient by itself to justify a protective sweep. *Johnson*, 1993 WL 385433, at \*4. And justification for a

protective sweep cannot be based on the dangerousness of the arrested individual; it must be based on an articulable suspicion of danger from *other* persons present in the home. *Colbert,* 76 F.3d at 777. The Government also points out that officers on the scene had no idea whether anyone else was in the home.[3] But a protective sweep cannot be justified by mere speculation that another person might be inside the house. *Colbert*, 76 F.3d at 778. Not knowing whether someone who may pose a danger to others is present is not an articulable fact that justifies a protective sweep. *See United States v. Lundin*, 47 F. Supp. 3d 1003, 1018 (N.D. Cal. 2014), *aff'd*, 817 F.3d 1151 (9th Cir. 2016) (holding that the fact that officers did not know if the defendant "was present at the home alone is of little probative value by itself"). Thus, the Government's argument that officers on the scene did not know if someone was inside the home is insufficient justification for a protective sweep under *Buie*.

At the time of the arrest, the officers had no reason to believe that there were any accomplices to the armed robbery. Both the surveillance video and information obtained from Lighthouse Deli employees revealed that there was only one suspect. Nowhere does the Government argue that officers saw or heard others inside the house. *See Lundin*, 47 F. Supp. 3d at 1018 (holding that a protective sweep was not justified because there were "no facts tending to show [the defendant] was accompanied: no other cars were parked in the driveway, no other voices were heard from within"); *cf. Hoyos,* 892 F.2d at 1396 (holding a protective sweep justified where officers reasonably believed six men were involved in the crime, observed four

---

[3] The Government also argues that the officers did not know the location of the gun used in the robbery, and they suspected that it was inside the home. But at the time officers entered the mobile home, Defendant was lying on the ground handcuffed and his father was outside the home in the presence of other officers. Thus, the location of the gun is only relevant if officers could articulate a suspicion that someone else was inside the home who might use the gun.

people leave the residence, and did not enter until they heard another officer shout that suspects were running back inside).

The Government contends that the SWAT team entered for the purpose of securing the home and not to investigate the crime. Officer Castro testified that he and a small number of SWAT team members entered the home, checked spaces in the residence big enough to hold a person, and then promptly exited the home. Even accepting the Government's contention and Officer Castro's description of the sweep as true, the officers' entry into the home was not supported by any articulable facts that would justify a protective sweep.

## II.     Suppression of Evidence as "Fruit of the Poisonous Tree"

Defendant argues that even though all the physical evidence seized from the home was obtained pursuant to a search warrant, the evidence should be suppressed because the search was "tainted by the officers' earlier illegal conduct." Def. Mot. 11. Defendant claims that law enforcement's decision to seek a search warrant was motivated by what officers saw during the initial sweep of the home. The Government contends that even if the protective sweep was unjustified, there is no evidence to suppress. No items were seized during the sweep and officers did not see anything of evidentiary value in plain view.

"In a federal prosecution the Fourth Amendment bar[s] the use of evidence secured through an illegal search or seizure." *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (quoting *Wolf v. People of State of Colorado,* 338 U.S. 25, 28 (1949)). Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). But "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the

Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)). The exclusionary rule requires suppression of both "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804 (1984).

However, not all derivative evidence must be suppressed. The exclusionary rule does not apply to evidence indirectly resulting from an unlawful search that is "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). In other words, there must be a causal connection between the unlawful search and discovery of the evidence the defendant seeks to suppress. *United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005). When there is an independent source for obtaining a search warrant under which evidence is seized, whether an earlier entry was unlawful is irrelevant to whether the seized evidence should be suppressed. *Segura*, 468 U.S. at 813-14.

Here, the items of evidence Defendant seeks to suppress—clothing, cigarettes, and a handgun—were seized from his mobile home when officers executed a search warrant issued by a Clackamas County Circuit Court judge. The warrant was based on the sworn affidavit of Detective Wilson. Although Detective Wilson was not at the scene during the arrest, he was asked by a Detective Sergeant Jesse Ashby to draft an affidavit in support of the search warrant. Detective Wilson testified that in drafting the affidavit, he gathered information from officers involved in the investigation either by speaking with them in person, by telephone, or by text message. By text message, he received screenshots from surveillance camera footage of the robbery at the Lighthouse Deli from which he was able to describe the clothes Defendant was

wearing. Detective Wilson stated that he did not recall knowing whether a protective sweep had occurred and did not receive any information about what officers saw during the sweep. He also did not know who made the decision to seek the search warrant.

To show probable cause that the items to be seized would be found at Defendant's residence, the affidavit relied on (1) surveillance video from the Lighthouse Deli; (2) a description of the crime, the suspect, and the items stolen provided by Lighthouse Deli employees; and (3) an interview with Defendant's father, who described the type of handgun he kept at home. Govt. Ex. 1. Because the K-9 unit tracked Defendant to his mobile home shortly after the robbery, Detective Wilson had reason to believe the clothing, cigarettes, and gun would be in the mobile home. The affidavit did not mention the initial sweep of the mobile home by the SWAT team.

Thus, none of the information used to secure the search warrant derived from officers' initial entry into the mobile home. The information Detective Wilson included in the affidavit came from sources entirely unconnected to the protective sweep. Even if the sweep was unjustified or pretextual as Defendant claims, nothing that officers may have observed during the sweep was necessary to secure the warrant. *See Segura*, 468 U.S. at 796 (holding that evidence should not be suppressed after officers illegally entered the defendant's apartment because "there was an independent source for the warrant under which that evidence was seized").

Defendant relies on *Murray vs. United States* to assert that the warrant could not genuinely be based on an independent source of information because "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry[.]" 487 U.S. 533, 542 (1988). Defendant claims that the cigarettes and clothing detailed in the search warrant were

readily in plain view during the initial sweep. Thus, according to Defendant, information gained from the sweep influenced law enforcement's decision to seek a warrant.

But the facts of this case are distinguishable from *Murray*. In that case, federal agents unlawfully entered a warehouse without a search warrant and found bales that contained marijuana. *Id.* at 535. The agents left without disturbing the bales, but then sought and obtained a search warrant to search the warehouse and seize the marijuana. *Id.* The Supreme Court vacated the lower courts' decision to admit this evidence because the lower courts did not explicitly find that the agents would have sought a warrant if they had not previously entered to the warehouse. *Id.* at 543.

In contrast to *Murray*, the Court finds that the officers here had sufficient independent sources of information to justify seeking a search warrant. Defendant cannot show that the initial sweep was the only available source of information that would provide probable cause to believe these items would be found in the mobile home. "To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred[.]" *Murray*, 487 U.S. at 542. The Court finds that officers involved had sufficient information from witness interviews and surveillance video to have probable cause secure a search warrant.

Even though the Government has not shown that the initial protective sweep was justified, evidence seized during the warrant search is sufficiently "attenuated as to dissipate the taint." *Nardone*, 308 U.S. at 341. The officers' initial unlawful entry does not require suppression of evidence seized while executing a search warrant obtained on the basis of information wholly unconnected to the initial entry. *See Segura*, 468 U.S. at 814. Accordingly, the Court denies Defendant's motion to suppress.

## CONCLUSION

Defendant's Motion to Suppress Evidence [53] is DENIED.

IT IS SO ORDERED.


DATED:_____March 22, 2022_____.



                                        _____Marco Hernandez_____
                                        MARCO A. HERNANDEZ
                                        United States District Judge